UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 21-77 |
| v. | * | SECTION: "M" |
| MICHAEL YUSKO, III | * | |

\* \* \*

## FACTUAL BASIS

Defendant **MICHAEL YUSKO, III ("YUSKO")**, has agreed to enter a plea of guilty in the above-captioned matter. Should this matter have proceeded to trial, the United States would prove beyond a reasonable doubt, through credible testimony and reliable evidence, the following facts. Unless stated otherwise, the following acts occurred within the jurisdiction of the Eastern District of Louisiana.

Federal agents have been engaged in an investigation regarding the fraudulent sale of Bitcoin (BTC) to individuals in California and Arizona by **YUSKO**. In or around May 2018, the FBI received complaints from at least three of **YUSKO**'s customers who complained that they had been defrauded by a person that they identified as **YUSKO**. According to these customers, **YUSKO** represented that he would send Bitcoin (BTC) to them in exchange for U.S. dollars (USD). The customers had contacted **YUSKO** because they were told by others that **YUSKO** was a source of legitimate BTC. The customers then contacted **YUSKO** for the purchase of BTC via telephone or email. **YUSKO** sent the customers an introductory email and claimed to be able to get any amount of BTC in exchange for USD at five percent above market price for a five percent fee. He also offered customers a one- to five-percent commission if they brought him new clients. **YUSKO** directed these clients to deposit USD into a bank account that was associated with a

AUSA _MP_
Defendant _MY_
Defense Counsel _IK_

business, such as Nervous Light Capital LLC, Ready Demolition LLC, Patriot Concrete Pumping, LLC, Praetorian Energy, LLC, and Hudson Oak Partners LLC. These companies, however, were not registered as money transmitting businesses with Financial Crimes Enforcement Network (FinCEN) of the Department of Treasury and otherwise did not comply with the regulations of Title 31, United States Code, Section 5330. **YUSKO** also instructed his clients not to tell any bank employees that the purpose of their wire transfer was to purchase cryptocurrency. Agents have learned that banks frequently shut down accounts used to sell cryptocurrency, and banks had previously shut down **YUSKO**'s accounts for such activity.

According to the customers who contacted federal agents, **YUSKO** failed to send them the full amount of BTC after the customers had wired USD to **YUSKO**'s bank accounts. **YUSKO** also failed to provide these customers with full refunds when they requested them.

*Loss to Victims R.C. and T.D.*

Victims R.C. and T.D. were introduced to **YUSKO** through a mutual acquaintance who had purchased BTC from **YUSKO**. R.C. and T.D., both residents of California, were business partners who purchased cryptocurrency together.

Victim T.D. contacted **YUSKO** via telephone to inquire about purchasing BTC in and around August 2017. **YUSKO** agreed to sell T.D. $80,000 worth of BTC and Ethereum (ETH), another cryptocurrency. **YUSKO** quoted T.D. 11.196 BTC and 495 ETH for $80,000.00. **YUSKO** instructed T.D. to deposit money into **YUSKO**'s business account at Chase Bank in New Orleans, Louisiana. The business account was under "Patriot Concrete Pumping." The bank account was held in the name of Patriot Concrete Pumping, LLC, a Louisiana company that was not registered as a money transmitter business with FinCEN. On November 29, 2017, T.D. wire transferred

AUSA
Defendant
Defense Counsel

$80,000 to the Chase Bank account for Patriot Concrete Pumping as directed by **YUSKO**. **YUSKO** promised to have the cryptocurrency transferred to T.D. by December 1, 2017.

Victim R.C. contacted **YUSKO** in November 2017 to purchase BTC at a 3% commission rate. **YUSKO** replied that "3% is very cool" and "Let me know when you're ready and I'll give you the bank details." R.C. agreed to send **YUSKO** $100,000.00 in return for 8.931761 BTC. As with victim T.D., **YUSKO** instructed R.C. to deposit money into **YUSKO**'s business account for "Patriot Concrete Pumping" at Chase Bank in New Orleans. **YUSKO** specifically instructed R.C. "not to mention Bitcoin or put it in the memo." On November 29, 2017, R.C. transferred $100,000.00 by wire transfer to the Chase Bank account for Patriot Concrete Pumping as directed by **YUSKO**. Subsequently, R.C. provided **YUSKO** with his BTC wallet address so that **YUSKO** could transfer BTC to R.C.'s wallet. **YUSKO** confirmed the receipt of R.C.'s wire transfer on November 30, 2017.

**YUSKO**, however, did not provide R.C. and T.D. with all of the cryptocurrency that they had purchased. In late December 2017, R.C. inquired about his BTC, to which **YUSKO** replied that R.C. should nonetheless refer customers to **YUSKO**, saying, "I can take care of them. I can get my hands on any coin you need as well. It can obviously help mitigate damages as well! I'll toss a 1% referral fee your way."

By January 2018, **YUSKO** had yet to send R.C. and T.D. the cryptocurrency that they had purchased. Both R.C. and T.D. repeatedly contacted **YUSKO** to inquire about the status of their order. **YUSKO** replied that he could wire back the cash to R.C. and T.D.; however, they replied that they wanted the cryptocurrency that they purchased.

3

AUSA
Defendant MY
Defense Counsel

From late January 2018 through April 2018, **YUSKO** sent R.C. and T.D. approximately $115,000.00 worth of cryptocurrency. However, by May 2018, **YUSKO** had not delivered the remaining $65,000.00 in cryptocurrency that he owed R.C. and T.D.

Through May 2018, R.C. and T.D. continued to communicate by email and text message with **YUSKO** in an attempt to obtain the rest of the cryptocurrency that they had purchased. In one of the last email communications between T.D. and **YUSKO**, dated May 31, 2018, **YUSKO** said his lawyers were "dotting the I's" in regard to an agreement to pay T.D. However, when **YUSKO** did not deliver as promised, T.D. told **YUSKO** that he would contact the F.B.I. In a text message to T.D., **YUSKO** replied that "if you want to get any of your money back I would advise against contacting the FBI." **YUSKO** further stated in the text that if T.D. should go and "get in touch with the Feds," then T.D. will "be out 180K," suggesting that T.D. would lose his money if he reported **YUSKO** to the FBI. **YUSKO** also texted "you sent money to bank accounts that I have nothing to do with. I'm just an employee," suggesting that **YUSKO** instructed the victims to deposit funds into accounts owned or operated by individuals/businesses other than himself. In truth and in fact, however, **YUSKO** handled all of these transactions and was not an "employee" of any person or business.

**YUSKO** thus far has not provided R.C. and T.D. with the remaining $65,000.00 in cryptocurrency that they purchased.

*Loss to Victim S.M.*

Victim S.M., a resident of Arizona, was introduced to **YUSKO** through the same mutual acquaintance who had introduced R.C. and T.D. to **YUSKO**.

In or around October 2017, S.M. contacted **YUSKO** to purchase approximately $70,000 worth of BTC. S.M. was in communication with **YUSKO** via telephone and email at

4

AUSA ___
Defendant ___
Defense Counsel ___

mike@nervouslightcapital.com. On October 19, 2017, S.M. wire transferred $70,000 to **YUSKO** for the purchase of BTC. These funds were transferred to a Citizens Bank account ending in 2160, under the name "Hudson Oak Partners LLC," as directed by **YUSKO**. According to the New Hampshire Department of State, Hudson Oak Partners LLC was operated by an associate of **YUSKO**, and it was not in good standing with the New Hampshire Department of State.

By May 2018, **YUSKO** still had not provided BTC as agreed. In the last email communication obtained by the FBI between S.M. and mike@nervouslightcapital.com, dated May 31, 2018, **YUSKO** indicated that "I'll have the whole thing in the next two weeks" in regard to an agreement to pay S.M. Similarly, **YUSKO** did not provide the full amount of BTC as agreed upon. Eventually, **YUSKO** only refunded S.M. approximately $10,000.00. **YUSKO** still owes S.M. approximately $60,000.00.

*Loss to Victims J.G. and S.R.*

Beginning in April 2018, J.G. and S.R., residents of Breaux Bridge, Louisiana, arranged to purchase BTC from **YUSKO**. J.G. and S.R. are related, and they were introduced to **YUSKO** by a mutual acquaintance.

J.G. contacted **YUSKO** and made two purchases of BTC from **YUSKO** via wire transaction. On April 20, 2018, J.G. wired approximately $8,000 to **YUSKO** in return for 1 BTC. On April 25, 2018, J.G. wired approximately $10,000 to **YUSKO** in return for 1.08 BTC. J.G. made both of these wire transactions to the Chase Bank account for Patriot Concrete Pumping, as **YUSKO** instructed. **YUSKO** signed promissory notes for each of these transactions. Between May and June 2018, **YUSKO** made two BTC transfers back to J.G.: one transfer of 0.25 BTC, and a second transfer of 0.143 BTC. **YUSKO** did not transfer the rest of the BTC that he owed to J.G.

5



AUSA
Defendant  MY
Defense Counsel

Shortly after J.G. had made the initial purchase from **YUSKO**, S.R. made a BTC purchase from **YUSKO**. On or about May 7, 2018, S.R. wired $10,000.00 to **YUSKO** in exchange for BTC. S.R. wired the funds to a Chase Bank account held by Praetorian Energy LLC, as **YUSKO** directed. Praetorian Energy LLC was not registered with FinCEN or with Louisiana Office of Financial Institutions as a money services business. **YUSKO** never provided any of the BTC that he promised to send S.R.

S.R. researched Praetorian Energy, LLC, and learned that it was a Louisiana company that was owned by an associate of **YUSKO**. S.R. contacted that person, who stated that he knew **YUSKO**, and that person agreed to try to help S.R. get her money and J.G.'s money back. However, that person was not able to persuade **YUSKO** to pay back S.R. or J.G. back. In an email dated May 19, 2018, **YUSKO** told J.G. to "stop harassing my friend/employee," i.e., the owner of Praetorian Energy, LLC, who had "nothing to do with this situation."

J.G. and S.R. attempted to persuade **YUSKO** to pay them back repeatedly through email communications. As recently as April 2019, **YUSKO** told J.G. that "by the end of next week I'll have it." However, **YUSKO** never paid J.G. or S.R. all of the BTC that he owed them. **YUSKO** still owes J.G. approximately $15,184.00, and he owes S.R. $10,000.00.

*Results of Email Search Warrant*

Pursuant to a federal search warrant, agents obtained records from **YUSKO**'s email address, mike@nervouslightcapital.com, which was operated by Google. The emails showed that **YUSKO** held himself out to be a money services business. **YUSKO** identified himself as a proprietary trader for his company Nervous Light Capital, provided information for instructions on deposits, methods of payments and bank wires, instructions for purchase, what to expect when working with **YUSKO**, and timeframes for the receipt of the client's BTC. **YUSKO** indicated that

AUSA _____
Defendant _____
Defense Counsel _____

he traded on several exchanges, to include Gemini and Kraken, that his margin was 5% above market price, and that he required a $1,000 minimum purchase of BTC. **YUSKO** provided a list of banks, to include TD Bank, SunTrust, Wells Fargo, Capital One, Citizens and a CO-OP Credit Union. If "clients" were asked anything about his business and/or what the transaction was for, "clients" were to say that they were "purchasing a product, Vintage Antiques," and that they know **YUSKO** personally. In the signature line, the email included: **YUSKO**'s hours of operation, his email address, and his address in New Orleans, Louisiana. Through an analysis of these communications, agents identified additional individuals who had been defrauded by **YUSKO**.

*Registration as Money Services Businesses*

Agents inquired into the status of the businesses whose bank accounts **YUSKO** used to sell BTC and other digital currencies. Agents learned that, at all times relevant, the following companies whose bank accounts **YUSKO** used were not registered as money transmitting businesses with the Louisiana Office of Financial Institutions or with FinCEN: Nervous Light Capital LLC, Ready Demolition LLC, Patriot Concrete Pumping, LLC, Praetorian Energy, LLC, and Hudson Oak Partners LLC. These companies were never registered as money transmitting businesses at any time during **YUSKO**'s sales of cryptocurrency. Ready Demolition LLC, Patriot Concrete Pumping, LLC, Praetorian Energy, LLC, and Hudson Oak Partners LLC were operated by other individuals, while **YUSKO** operated Nervous Light Capital LLC. Only one company operated by **YUSKO**, Bookie LLC, was registered as a money services business. Agents interviewed the individual who owned Patriot Concrete Pumping, LLC, and Praetorian Energy, LLC. He confirmed that these companies were not registered as money transmitting businesses, and that **YUSKO** asked him to allow him to use these companies' bank accounts for BTC sales.

7


AUSA
Defendant  MY
Defense Counsel

**YUSKO** said that he needed to use these accounts because banks would not permit him to sell BTC using his own bank accounts.

*Execution of Search Warrant on June 13, 2019 at YUSKO's Residence*

Based on the foregoing information, federal agents applied for a warrant to search **YUSKO**'s residence in New Orleans. The Honorable Karen Wells Roby authorized the warrant on June 7, 2019, and agents executed the warrant on June 13, 2019. The warrant also authorized agents to search any electronic device on the premises in order to seize and preserve any cryptocurrency. On the day of the warrant execution, agents found **YUSKO**, his spouse, and their child at the residence. After agents knocked and announced their presence at the front door, **YUSKO** answered the door. He was temporarily detained for the purposes of the search, while his spouse and child were allowed to sit together on the porch. After performing a protective sweep of the residence and finding no other individuals in the house, agents began conducting a search of the residence.

During the search of the home, agents found three rooms on the main floor that were used as bedrooms. One appeared to be used by **YUSKO**'s child. Another bedroom contained women's clothing, makeup, etc. A third bedroom contained men's clothing. **YUSKO** indicated to agents that it was his bedroom. Agents found an Apple MacBook Pro open with the screen displaying a Chrome browser that was logged into michaelyusko@gmail.com. Pursuant to the authorization on the search warrant, agents searched the Device for any cryptocurrency saved on the computer. Agents located a bitcoin wallet, called Bitpay, with approximately $400 in cryptocurrency. Agents seized that bitcoin wallet on-site. Agents also seized an Apple iPhone in this bedroom.

Upon examining the Apple MacBook Pro on-site, agents discovered that the browser had several usernames that were consistent with usage by **YUSKO**, such as "Michael Yusko,"

AUSA ___
Defendant ___
Defense Counsel ___

"Yusko1," and "Nervous Light Capital." As the browser was open and logged into Bitmex, a BTC exchange website, agents continued to search for credentials to other cryptocurrency and/or exchange websites. Upon discovery of several of the exchange websites, agents requested passwords from **YUSKO**. **YUSKO** then walked up to the Apple Macbook Pro, typed on the keyboard, and closed at least one web browser tab, obstructing the examination of the contents of the webpage that was open prior to **YUSKO** closing it. Agents instructed **YUSKO** that he was not to touch any electronic devices during the course of the search.

Agents located a loft on the second floor that appeared to be used as an office by **YUSKO**. During a search of the loft, agents found thirteen electronic devices along with various documents. These documents included documents related to Nervous Light Capital and credit cards in **YUSKO**'s name. Included among the thirteen electronic devices was a cryptocurrency hardware wallet, portable external hard drives, iPhones, a laptop, and an Apple TV device. Agents also recovered bank documents that confirmed that **YUSKO** was utilizing bank accounts to sell BTC that were not owned by any registered money services businesses.

For the purposes of sentencing, the parties agree that, as a result of this offense, **YUSKO** is responsible for $201,399.00 in losses to victims and/or funds that passed through his unlicensed money services businesses. The parties agree that any such loss amount does not include any amounts provided by **YUSKO** pursuant to a proffer agreement, and the parties agree that the Court may include such amounts as part of a restitution order.

AUSA _____
Defendant _____
Defense Counsel _____

## Limited Nature of Factual Basis

This proffer of evidence is not intended to constitute a complete statement of all facts known by **YUSKO**, and it is not a complete statement of all facts described by **YUSKO** to the government. Rather, it is a minimum statement of facts intended to prove the necessary factual predicate for his guilty plea. The limited purpose of this proffer is to demonstrate that there exists a sufficient legal basis for **YUSKO**'s plea of guilty to the charged offenses.

_____ 8/5/2021
MATTHEW R. PAYNE    Date
Assistant United States Attorney

_____ 7/5/21
IAN ATKINSON    Date
Attorney for Michael Yusko, III

_____ 7/5/21
MICHAEL YUSKO, III    Date
Defendant